Argued and submitted March 8, 2004; resubmitted en banc September 22, reversed and remanded December 29, 2004

Kyra BURKE,
*Respondent,*

*v.*

OXFORD HOUSE OF OREGON CHAPTER V,
an unincorporated association;
Oxford House-Ramona,
an unincorporated association;
and Oxford House, Inc.,
a Delaware corporation,
*Appellants.*

0105-05394; A119933

103 P3d 1184

Frank Wall argued the cause and filed the briefs for appellants.

Edward Johnson argued the cause for respondent. With him on the brief were Mark Passannante, Broer & Passannante, P. S., and Oregon Law Center.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Schuman, Wollheim, and Ortega, Judges, and Deits, Judge pro tempore.

ARMSTRONG, J.

Landau, J., concurring.

Schuman, J., concurring.

Edmonds, J., dissenting.

## ARMSTRONG, J.

Defendants Oxford House of Oregon Chapter V, Oxford House-Ramona, and Oxford House, Inc., appeal from a judgment for plaintiff on a claim under the Oregon Residential Landlord and Tenant Act (ORLTA). Defendants' two assignments of error amount to an assertion that the trial court erred in entering summary judgment for plaintiff because ORLTA does not apply to them. Defendants present two arguments. First, they argue that ORS 90.110 excludes them from ORLTA's coverage. Second, they argue that, to the extent ORLTA applies to them, it is preempted by the Federal Anti-Drug Abuse Act of 1988, 42 USC § 300x-25 (2000). Because we conclude that ORS 90.110 does indeed exclude defendants from ORLTA's coverage, we need not address defendants' preemption argument. We reverse.

Because the trial court ruled on cross-motions for summary judgment, we determine whether either party is entitled to judgment as a matter of law. *Stevens v. Bispham*, 316 Or 221, 223, 851 P2d 556 (1993). For the following reasons, we conclude that defendants are entitled to judgment under that standard.

Oxford House, Inc., is a national organization dedicated to helping recovering drug and alcohol addicts make the transition to independent lives in an environment that allows them to continue their recovery process without professional supervision. To promote that goal, Oxford House, Inc., and local organizations such as Oxford House of Oregon Chapter V have established unsupervised halfway houses for recovering addicts. The Oxford House model is based on three basic rules: (1) each house must be a self-governing democracy; (2) each house must be financially self-sufficient; and (3) any person using drugs or alcohol must be immediately expelled from the house. Oxford House-Ramona is an Oxford House located in Portland.

Plaintiff lived in Oxford House-Ramona. By majority vote, her coresidents found her in violation of an Oxford House rule prohibiting disruptive behavior. They evicted her from the house with 15 minutes' notice, and she complied. She subsequently brought an action against defendants,

claiming that defendants had evicted her in violation of ORLTA's eviction requirements, specifically ORS 90.400. The trial court concluded (1) that the parties had a landlord-tenant agreement of the type covered by ORLTA; (2) that defendants were not exempt from ORLTA under ORS 90.110; (3) that the relevant provisions of ORLTA were not pre-empted by the Federal Anti-Drug Abuse Act of 1988; and (4) that plaintiff was entitled to her requested relief. Defendants challenge the last three conclusions on appeal.

Properly understood, two of the exclusions in ORLTA operate to exclude plaintiff's residential arrangement with defendants from the act: (1) ORS 90.110(3), which excludes "[o]ccupancy by a member of a fraternal or social organization in the portion of a structure operated for the benefit of the organization"; and (2) ORS 90.110(1), which excludes "[r]esidence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational, counseling, religious or similar service, but not including residence in off-campus nondormitory housing."

ORLTA broadly sweeps non-owner-occupied residential rental relationships into its coverage. ORS 90.115 provides that ORLTA "applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located within this state." However, ORS 90.110 excludes a limited class of rental arrangements from coverage under ORLTA. ORS 90.110 provides:

"Unless created to avoid the application of this chapter, the following arrangements are not governed by this chapter:

"(1)   Residence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational, counseling, religious or similar service, but not including residence in off-campus nondormitory housing.

"(2)   Occupancy of a dwelling unit for no more than 90 days by a purchaser prior to the scheduled closing of a real estate sale or by a seller following the closing of a sale, in either case as permitted under the terms of an agreement for sale of a dwelling unit or the property of which it is a

part. The occupancy by a purchaser or seller described in this subsection may be terminated only pursuant to ORS 91.130. A tenant who holds but has not exercised an option to purchase the dwelling unit is not a purchaser for purposes of this subsection.

"(3)   Occupancy by a member of a fraternal or social organization in the portion of a structure operated for the benefit of the organization.

"(4)   Transient occupancy in a hotel or motel.

"(5)   Occupancy by a squatter.

"(6)   Vacation occupancy.

"(7)   Occupancy by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises. However, the occupancy by an employee as described in this subsection may be terminated only pursuant to ORS 91.120.

"(8)   Occupancy by an owner of a condominium unit or a holder of a proprietary lease in a cooperative.

"(9)   Occupancy under a rental agreement covering premises used by the occupant primarily for agricultural purposes."

The enumerated exclusions essentially fall into two groups: (1) exemptions for short-term housing and (2) exemptions for housing where the primary relationship between the parties is something other than a traditional residential landlord-tenant relationship.[1] The exclusions in ORS 90.110(4) and (6) govern short-term housing ("[t]ransient occupancy in a hotel or motel" and "vacation occupancy" respectively). Underlying those exclusions is an assumption that the occupant of the property has a primary residence

---

[1] The dissent asserts that the exclusions in ORS 90.110 "ought to be strictly and narrowly construed" to avoid undermining the purposes of ORLTA. 196 Or App at 748 (Edmonds, J., dissenting). That assertion reflects a discredited presumption that courts formerly used in construing statutes. *See generally* Norman J. Singer, 2A *Sutherland Statutory Construction* § 47.11(5th ed 1992). If that principle were sound, then the Bill of Rights would have to be strictly and narrowly construed to avoid undermining the function of representative government. At bottom, there is no reason to presume that the policies embodied in the exceptions are more or less important than the policies embodied in the general provisions of the act. Our task is to make sense of them as a whole.

somewhere other than the property at issue and that short-term housing should not be subject to ORLTA. The remainder of the exclusions exempt arrangements where the primary relationship between the parties is something other than a traditional residential landlord-tenant relationship.

In the latter category of exemptions, the legislature has recognized that the encouragement of the underlying, primary relationship is more important than the protection of tenants. For example, ORS 90.110(2) recognizes that it is often necessary in real estate sale agreements for either the seller or buyer of real property to possess the property for a period of time while legal title is in the hands of the other party. Thus, the legislature exempted those arrangements from ORLTA to avoid burdening real estate transactions with the requirements of the act. ORS 90.110(7) recognizes that the relationship of employer and employee is the predominant relationship in situations in which an employee lives and works on the employer's property. It reflects that by exempting the landlord-tenant relationship from most aspects of ORLTA.

The same principle applies to the exemptions in ORS 90.110(1) and (3). Both subsections describe relationships in which the primary relationship between the parties is the relationship that is described in the subsections rather than the landlord-tenant relationship that the parties also share.

For example, the relationship between a fraternity member who lives on fraternity property and his fraternity predominates over the landlord-tenant relationship that exists between them by the fact of his residence. But for his membership in the fraternity, he would not be a tenant of the fraternity. With ORS 90.110(3), the legislature chose to subordinate the landlord-tenant relationship to the membership relationship so that, if an individual's membership is terminated, the fraternity can demand that he vacate its premises without compliance with the strictures of ORLTA.

Similarly, the relationship between a hospital and its patients predominates over the landlord-tenant relationship, as does the relationship between a nursing home or a college dormitory and its residents. ORS 90.110(1) makes

clear that changes in the primary relationships should not be burdened by ORLTA. If a college student drops out of classes, the college should not be required to allow him to remain in his dorm room for 30 days. Nor should a hospital be required to give a patient 30 days' notice to vacate her room after the hospital has decided to discharge her. Thus, both ORS 90.110(1) and (3) create exemptions from ORLTA for housing where the primary relationship between the parties is something other than the traditional residential landlord-tenant relationship.

It is with that understanding in mind that we must construe the language of ORS 90.110(1) and (3) and apply it to the facts of the case before us. The proper interpretation of those provisions is that they exclude defendants from ORLTA.

■ We start with ORS 90.110(3), which excludes from ORLTA "[o]ccupancy by a member of a fraternal or social organization in the portion of a structure operated for the benefit of the organization." Applying the legislature's intent when it excluded fraternal and social organizations reveals that defendants are *both* fraternal *and* social organizations.[2]

Although the legislature did not define either "fraternal" or "social," it did define "organization." Under ORS 90.100(26), " '[o]rganization' includes a corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership or association, two or more persons having a joint or common interest, and any other legal or commercial entity." The record reflects that defendant Oxford House, Inc., is a nonprofit corporation and that defendants Oxford House of Oregon Chapter V and Oxford House-Ramona are unincorporated associations. Thus, there is no dispute that defendants are organizations. The question becomes whether they are fraternal or social organizations.[3]

---

[2] The exclusions listed in the various subparagraphs of ORS 90.110 are not mutually exclusive; nor should the particular categories within each subparagraph be read to be mutually exclusive. Just as a nursing home may be an institution that provides both medical and geriatric services, and an organization such as an Elk's Lodge can be both fraternal and social, so too can an on-campus fraternity house satisfy the exclusions under both ORS 90.110(1) and (3).

[3] The dissent insists that the answer to that question cannot be determined by consulting the text and context of the statute. It looks instead to legislative history

The word "fraternity" can be understood to describe

"**1:** a group of people associated or formally organized for a common purpose, interest, or pleasure: as **a:** a religious or ecclesiastical brotherhood **b:** a usu. organized group of men of the same class, occupation, interest, or pursuit : COMPANY, GUILD : fraternal order **c:** a national or local men's student organization formed chiefly for social purposes having secret rites and a name consisting of usu. three Greek letters; *also* : an organization of alumni who were members of such an organization **d:** a student organization for scholastic, professional, or extracurricular activities; *esp* : a national honorary organization including students and alumni[.]"

*Webster's Third New Int'l Dictionary* 903 (unabridged ed 2002). As the above description shows, fraternities are not limited to student groups; they also include associated groups of people with the same pursuit. Although it is not dispositive of the issue, it is nonetheless persuasive to recognize that defendants thought of themselves as a fraternity even before this litigation began. *See Oxford House Manual: An Idea Based on a Sound System for Recovering Alcoholics and Addicts to Help Themselves* 3 (2d ed 1999) ("[Oxford House] is a very special fraternity."); *id.* at 4 (acknowledging that the

---

and general maxims of statutory construction. It relies on a comment to the Uniform Residential Landlord and Tenant Act that the act "is not intended to apply where residence is incidental to another primary purpose * * *." Uniform Residential Landlord and Tenant Act §1.202 Comment, 7B ULA 539 (2000). It appears to believe that that statement bears on the proper interpretation of the exemption in ORS 90.110(3); that is, that fraternal and social organizations must have a primary purpose other than housing in order to come within the exemption. As we discuss later in the opinion, we disagree. But we pause at this point to note one aspect of the legislative history cited by the dissent. Only one exemption in ORS 90.110 requires housing to be incidental to another purpose, the exemption in ORS 90.110(1). It is clear from the commentary to the uniform act that the phrase on which the dissent relies applies to only some of the exclusions in ORS 90.110, and the exception for fraternal and social organizations is not one of them. The complete sentence from the comments on which the dissent relies reads, "[The Act] is not intended to apply where residence is incidental to another primary purpose such as residence in a prison, a hospital or nursing home, a dormitory owned and operated by a college or school, or residence by a landlord's employee such as a custodian, janitor, guard or caretaker rendering service in or about the demised premises." URLTA § 1.202 Comment. Furthermore, seven sentences later the commentators provide a comment specific to the fraternal and social organization exception that makes no reference to purposes, primary or otherwise. In sum, the legislative history relied on by the dissent does not shed any insight into the intent behind ORS 90.110(3).

fraternity house concept served as the model for the first Oxford House). Defendants are organized groups of people with the same pursuit: sober, independent living.

The involvement of Oxford House "alumni" in the organization further supports the conclusion that defendants are fraternal organizations. Alumni contribute financially to the program and provide ongoing support. In fact, Oxford House Tradition Nine provides, "Members who leave an Oxford House in good standing are encouraged to become associate members and offer friendship, support, and example to newer members." Former Oxford House members who participate in that way are part of the national Oxford House Tradition Nine Club, whose members "share their experience, strengths and hope in order to expand the Oxford House movement and keep it operating and expanding in a way to assure other recovering individuals the same opportunity they have enjoyed."

Defendants also are fraternal organizations in the "confederation" sense of the word. "Confederation" can be understood to mean "an act of confederating or a state of being confederated : a compact for mutual support[.]" *Webster's* at 475. A "confederacy" is, among other things, "a league or compact between two or more persons, bodies of men, or states for *mutual support* or common action." *Id.* (emphasis added). Defendants are groups of people who have come together to provide mutual support in battling addiction; their compacts are the membership agreements in which each individual agrees to remain drug and alcohol free so long as each resides at an Oxford House. In that sense, they are confederates in a confederation and are, thus, a fraternal organization.

Furthermore, defendants are social organizations. "Social" means, among other things, "involving allies or confederates." *Webster's* at 2161. In light of the above "confederation" discussion, defendants are organizations involving confederates in the battle against addiction. "Social" also can be understood to mean "of, relating to, or concerned with the welfare of human beings as members of society." *Id.* Defendants are organizations formed to aid individuals with addictions. Certainly, that concerns the welfare of human beings

as members of society. While it may be a benefit to the residents themselves, as opposed to society as a whole, it is still a *social* purpose. It follows that defendants are social organizations.

For us so to hold is not a novel construction of "social organization," for that is precisely the conclusion that a court reached in *YMCA of Stamford v. Bentley*, 37 Conn L Rptr 397 (Conn Super Ct 2004). There, the purported landlord—the YMCA—argued that it was excluded from the scope of Connecticut's landlord-tenant act because it is a social organization under a provision identical to ORS 90.110(3). The court, applying a dictionary definition of "social" very similar to the one quoted above,[4] concluded that the YMCA was indeed a social organization because its "programs exemplify [its] commitment to promoting the welfare of its members." *Id.* at 399. The YMCA presented the Connecticut court with an organization that worked to better the welfare of its own members, that is, a social organization that focuses on its own members rather than society as a whole. The Connecticut court concluded that promoting the benefit of its own members was sufficient to render the YMCA a "social organization."

The dissent argues that the Connecticut court concluded that the YMCA was a social organization largely based on a statement in the YMCA's charter, which "describes the primary purpose of the organization as to 'carry out various charitable projects for the religious, social and educational improvement of its members.'" *Id.* While that statement may have played a role in the court's conclusion, the result in the case did not depend on the proposition that the YMCA intended to engage in charitable activities. The court was at least as persuaded by the YMCA's "commitment to promoting the welfare of its members." *Id.* In any

---

[4] The Connecticut court used *Merriam-Webster's Collegiate Dictionary*, which defines "social" in a nearly identical manner to *Webster's Third New Int'l Dictionary*. *YMCA of Stamford*, 37 Conn L Rptr at 399. *Compare Webster's* at 2161 ("of, relating to, or concerned with the welfare of human beings as members of society") *with Merriam-Webster's Collegiate Dictionary* 1114 (10th ed 1993) ("of or relating to human society, the interaction of the individual and the group, or the welfare of human beings as members of society"). The Connecticut court focused on the phrase "the welfare of human beings as members of society." *Merriam-Webster's* at 1114.

event, to the extent that an organization's statements about itself are persuasive as to whether it is covered by ORLTA, we note that Oxford House's incorporation certificate identifies as the organization's first purpose: "[t]o improve the rehabilitation, industrial, and *social* condition and environment for recovering alcoholics, by the development of plans and programs for their recovery and rehabilitation and by establishing, operating, and maintaining homes for recovering alcoholics." (Emphasis added.)

Having concluded that defendants are fraternal and social organizations, we must address whether plaintiff's room was a "portion of a structure operated for the benefit of the organization." ORS 90.110(3). Plaintiff insists that it was not and that, if the defendants are fraternal or social organizations, then only the common areas of Oxford House-Ramona are operated for the benefit of the organization. Plaintiff is incorrect on both points. Oxford House as an organization benefits from the operation of sleeping quarters like plaintiff's. First, it receives a financial benefit that allows it to operate. Second, by having its members live under the same roof, Oxford House creates the community on which it relies to promote sobriety and independent living. Finally, to accept plaintiff's argument that only the common areas of the house are operated for the benefit of the organization and are therefore excluded under ORS 90.110(3) would create the absurd result under which defendants would be bound to warrant the habitability of plaintiff's sleeping quarters but would not be so bound with respect to the kitchen, bathroom, living room, and other areas of the house. Either all of Oxford House-Ramona is operated for the benefit of the organization or none of it is. We conclude that all of it is, and it is thus exempt from ORLTA.

The dissent maintains that ORS 90.110(3) does not apply to defendants because plaintiff's residency is not incidental to defendants' primary purpose. We disagree with that proposition on two levels. First, as we discuss in other parts of this opinion, Oxford House's primary purpose is to assist addicts in recovery, not to provide housing. Second, whether residence is incidental to some other purpose is relevant only to the analysis under ORS 90.110(1) and, as we discuss below, that analysis in that context reveals that

plaintiff's residence at Oxford House was incidental to her receipt of services similar to counseling.

Second, the dissent incorrectly understands our opinion. It reads our opinion to recognize in each exemption in ORS 90.110 a requirement that the occupancy or residency be incidental to the organization's purpose to qualify for exempt status. We recognize no such requirement because there is none. To the extent that the dissent understands our classification of the various exemptions in ORS 90.110 into two classes, one of them being "exemptions for housing where the primary relationship between the parties is something other than a traditional residential landlord-tenant relationship," to import a "primary purpose" test into every exemption, that understanding is wrong. The primary relationship between parties may be something other than a landlord-tenant relationship even if the primary purpose of the landlord or tenant or both is housing. For example, the primary purpose of a home buyer who takes possession of a residential property before the close of the real estate transaction is to establish a residence, and the primary purpose of the seller who allows him to do so is to provide housing. Often there is even consideration in such a transaction. Nonetheless, the primary relationship between these parties is not a landlord-tenant relationship. Instead, the primary relationship between them is buyer-seller.

Similarly, an individual may choose to join a fraternity solely for the housing aspect of the relationship, or a fraternity may even organize solely for housing purposes. Nonetheless, the primary relationship between the parties is that of member-fraternity, not landlord-tenant. The dissent's primary purpose rule—purportedly derived from legislative history and maxims of statutory construction—would contradict the plain language of ORS 90.110(3) by subjecting to ORLTA coverage fraternal or social organizations whose primary purpose is to provide housing for their members. For that reason, among others, the dissent's interpretation cannot be correct.

■ The defendants are not only exempted from ORLTA by ORS 90.110(3) but by ORS 90.110(1) as well. ORS

90.110(1) excludes from ORLTA "[r]esidence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational, counseling, religious or similar service, but not including residence in off-campus nondormitory housing." To satisfy that exclusion, there must be (1) an institution (2) that provides medical, geriatric, educational, counseling, religious or similar services and (3) residence at that institution must be *incidental* to the provision of those services.

■ Plaintiff contends that defendants' argument under ORS 90.110(1) is not preserved because defendants did not specifically refer to that subsection in making their arguments to the trial court. Defendants acknowledge that they did not refer specifically to ORS 90.110(1), but they maintain that the issue is preserved because they argued that "housing was incidental" and "whether housing was incidental has no relevance except under ORS 90.110(1)." We need not decide whether defendants' reference to incidental housing was sufficient because, even if it were not, we still must address the applicability of ORS 90.110(1). Defendants preserved the general issue whether they are exempt from ORLTA, and we are required to interpret the applicable statutes correctly even when preservation in the trial court does not occur. *See, e.g., Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 3, 951 P2d 720 (1998); *Burk v. Hall*, 186 Or App 113, 118, 62 P3d 394, *rev den*, 336 Or 16 (2003).

An "institution" can be understood to be "something that is instituted * * * as * * * an established society or corporation : an establishment or foundation esp. of a public character." *Webster's* at 1171. Founded in 1975, with hundreds of locations today, Oxford House certainly is an established corporation and therefore satisfies the first requirement of ORS 90.110(1).[5] Thus, the question becomes whether defendants provide the requisite services.

---

[5] The dissent maintains that "defendants are not the kinds of institutions that ORS 90.110(1) excludes from ORLTA coverage." 196 Or App at 750 (Edmonds, J., dissenting). To support that conclusion, it relies on *Gray v. Pierce County Housing Authority*, 123 Wash App 744, 97 P3d 26 (2004). There the court concluded that a public housing authority that provided educational services was not an

Defendants do not provide medical, geriatric, educational, or religious services. Furthermore, defendants admitted that they do not provide on-site professional counseling services. Nonetheless, the environment of self-policing and mutual support at Oxford House combines with the zero-tolerance principles to amount to services similar to counseling; that is, Oxford House provides peer supervision, support, and counseling. The record is replete with support for the conclusion that the services that members of an Oxford House provide to one another are similar to counseling services.[6]

Before a recovering addict is accepted as a member in an Oxford House, she must go through an intense interview with a current member. One of the questions the interviewer asks is this: "Can you tell us behaviors that may

---

"institution" under the Washington Residential Landlord Tenant Act. However, the Washington statute is not identical to ORLTA, and the Washington court relied heavily on the aspects that are different. The Washington statute exempts

"[r]esidence at an institution, whether public or private, where residence is merely incidental to detention or the provision of medical, religious, educational, recreational, or similar services, *including but not limited to correctional facilities, licensed nursing homes, monasteries and convents, and hospitals*[.]"

RCW 59.18.040 (emphasis added). The second, italicized half of the Washington provision is absent from ORS 90.110(1). The *Gray* court viewed those words to limit the types of institutions that could claim the exemption. *See Gray*, 123 Wash App at 758-59, 97 P3d at 33 ("PCHA asks this court to construe this provision as applying to any 'institution' offering residence incidental to providing one or more of the enumerated services. * * * *However, we cannot simply ignore the second half of the provision. The provision, by its plain terms, applies only to institutions similar in kind to those specifically enumerated. Here, PCHA is not an 'institution' as the term is used in the statute; its institutional purpose is not to provide educational services." (Emphasis added; citation and footnote omitted.)) In the absence of similar language, the Oregon statute cannot be interpreted to include a similar limitation on the types of institutions that are exempt under ORS 90.110(1).

[6] The dissent argues that ORS 90.110(1) requires defendants, as organizations, to provide services similar to counseling and that any such services provided to Oxford House residents are provided by other residents and not by defendants. That argument falsely assumes that there is a separate existence between an Oxford House and its members. An Oxford House *is* its members. Business associations like defendants can act only through their agents, and here defendants' members are their agents. Plaintiff herself implicitly acknowledges that because her entire theory rests on the fact that, when members of an Oxford House act, it is, in fact, Oxford House acting. She was evicted by other members of an Oxford House. If the actions of their members may be imputed to the defendants when they vote to evict another member, then their counseling-like actions must be imputed as well.

indicate that you may be headed toward a relapse? If we see these behaviors in you, would you comply with a House vote for special requirements?" The point of that inquiry is to enable the residents of an Oxford House to intervene if one of their fellow members appears to be headed toward a relapse. If intervention is not in fact counseling, then it is at least similar to counseling. "Counseling" can be understood to be "a practice or professional service designed to guide an individual to a better understanding of his problems and potentialities by utilizing modern psychological principles and methods[.]" *Webster's* at 518. Intervention by fellow Oxford House members before a relapse can guide the troubled member to a better understanding of her problems and prevent her from returning to addiction.[7]

One "special requirement" that an Oxford House vote may impose if the house suspects that a member is headed toward a relapse is that the troubled member attend Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings. While many Oxford House members participate in AA or NA, participation is not generally a requirement. However, according to Oxford House Tradition 4, "[i]f a resident's non-attendance at AA or NA meetings is causing problems—for the individual or the house—the residents may vote at a meeting to make meeting attendance for a particular member a condition of living in the house."

Members of Oxford House provide to one another, within a safe environment, services analogous to those provided by professional counselors in the field of rehabilitation. Each member has financial, social, administrative, and emotional duties to the other members. Without the three basic rules—self-governance, financial self-sufficiency, and automatic expulsion for relapse—and the accompanying duties, according to Oxford House founder J. Paul Molloy, "it is too easy to lapse into abuse again." According to Molloy, "[a]n essential component of recovery is security derived from living in a clean and sober environment with peer support that encourages responsible individual behavior."

---

[7] Oxford House-Ramona member Shannon Stowell testified at her deposition, "Whenever I feel like I want to use, I know I can go to one of [my fellow members.]"

One example reflected in the record of how the mutual support network functions to encourage sobriety at an Oxford House is the house's efforts to be sure no one feels alone. On that point, Molloy says, "One factor leading to relapse is loneliness. The Oxford House concept remedies this problem by placing two persons to a room where practical. By having * * * a roommate, an individual in times of loneliness, despair, anger, rejection, depression, or having a bad day, will be able to have another recovering individual to talk to about her problem, and obtain a constructive manner to deal with the problem other than resort to drugs and alcohol." In the mutually supportive environment of the Oxford House, each member "reinforce[s the] other's desire to stay clean and sober forever." Even plaintiff admitted that, at Oxford House, the residents look to each other for support.

As a voluntary association of recovering addicts, Oxford House provides a support network for its members that amounts to counseling. On this point, Molloy stated:

"AA, which was founded in 1935, provides the other strong support for the Oxford House system which is the notion of relying upon voluntary self-help, which, as you probably know from Alexis de Tocqueville [*sic*] wrote a book, *Democracy in Action* when he toured the United States in 1835.

"And he was a Frenchman who came over here and has a whole chapter on voluntary associations. And, of course, Oxford House is very much a voluntary association. Groups who are recovering alcoholics and drug addicts, you know, take advantage of the First Amendment and say, hey, we want to form an association. And they group together and help each other stay clean and sober."[8]

Those highlights of the record establish that defendants provide services similar to counseling to their residents. Thus, the question becomes whether residence at Oxford House is incidental to those services. It is.

Unless its use here is ambiguous, we must give the term "incidental" its plain meaning. *PGE v. Bureau of Labor*

---

[8] That excerpt from the record also supports our conclusion that defendants are fraternal organizations within the meaning of ORS 90.110(3).

*and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). "Incidental" can be understood to mean "subordinate, nonessential, *or* attendant in position or significance: as * * * occurring as a minor concomitant[.]" *Webster's* at 1142 (emphasis added). That meaning is consistent with the construction given the term by the Washington Court of Appeals in *Sunrise Group Homes, Inc. v. Ferguson*, 55 Wash App 285, 777 P2d 553 (1989). In *Sunrise Group Homes, Inc.* the court was asked to determine whether the Washington counterpart to ORLTA applied to a particular congregate care home. *Id.* at 286, 777 P2d at 554. The Washington court concluded that it did not, because the plaintiff's residence at the facility was incidental to the services that she received there. *Id.* at 289, 777 P2d at 555. The court stated that incidental "does not mean that room and board must be trivial or unimportant in comparison with the overall institutional purpose; it means that living there is *subordinate or attendant* to the institutional purpose." *Id.* (emphasis added). Without citing *Webster's*, the Washington court used a dictionary description of the uses of incidental in its construction of that term.

Residence at Oxford House is merely attendant to defendants' institutional purposes. The purpose of an Oxford House is to provide a group environment in which members can support and help each other maintain sobriety and achieve self-reliance. The three basic rules reflect the goals of sobriety, self-governance, and self-support. Residence at the facility is attendant to those purposes, just as residence in a campus dormitory is attendant to college enrollment, *Sunrise Group Homes, Inc.*, 55 Wash App at 289, 777 P2d at 555, and residence at a nursing home is attendant to around-the-clock geriatric care.

As defendants persuasively argued in their motion for summary judgment:

> "[P]rospective Oxford House members do not seek housing where it may be convenient for them. Nor do they look for a home that they think is aesthetically pleasing, or in a neighborhood that they particularly enjoy. Potential members seek out available memberships in Oxford Houses,

specifically in an attempt to join the organization. Prospective members want to benefit from the other members' support and from the members' common goal of a healing environment. In other words, the physical surroundings of an Oxford House are secondary to the support and emotional benefit of belonging to a group of one's peers."

In those ways, residence at Oxford House is fundamentally different from traditional housing. People seeking membership at Oxford House are seeking to maintain their sobriety, establish themselves financially, and govern their own lives without the "overseer" that typically accompanies residence at a halfway house. The fact of residence is subordinate or attendant to those purposes. Thus, residence at an Oxford House is incidental to the counseling-like services that residents receive.[9]

■        Because we conclude that defendants are excluded from the scope of ORLTA by ORS 90.110(1) and (3), we must resolve a final question before concluding that ORLTA does not apply to defendants: whether the arrangement between plaintiff and defendants was created to avoid the application of ORLTA to defendants. *See* ORS 90.110 (providing exclusions from ORLTA for certain arrangements "[u]nless created to avoid the application of this chapter"). Plaintiff points to Oxford House documents that explain the importance of

---

[9] The dissent disagrees with that conclusion as well, objecting that the primary purpose of Oxford house is "to provide low-cost housing in which individuals can support each other as they recover from addictions." 196 Or App at 751 (Edmonds, J., dissenting). The dissent relies for support for that statement on the trial court's written finding that

"Oxford house exists for the sole purpose [of] assist[ing] drug and alcohol dependant individuals in their recovery, the way in which Oxford House does so is to provide drug and alcohol free housing. It is the housing that is central to the relationship."

With respect, the finding actually cuts the other way. The trial court did not find that the primary purpose of Oxford House is to provide low-cost housing. In fact, the trial court found, and the record supports, that defendants' sole purpose is to assist addicts with recovery. For example, the first purpose listed in Oxford House, Inc.'s, incorporation certificate (which some might call a primary purpose), is "[t]o improve the rehabilitation, industrial, and social condition and environment for recovering alcoholics, by the development of plans and programs for their recovery and rehabilitation and by establishing, operating, and maintaining homes for recovering alcoholics." Granted, housing may be central to that relationship, but it is nonetheless incidental, just as housing is central in a residential geriatric facility yet incidental to the facility's sole purpose of assisting seniors in their daily living.

entering into leases for new Oxford Houses in the name of the entity rather than an individual and argues that defendants have structured themselves to avoid the requirements of ORLTA. At most, those documents show that Oxford House is careful about the relationship between it and the ultimate landlord, namely the property owner. However, that relationship is not at issue in this case. The relationship in question here is that between plaintiff and defendants. Plaintiff's evidence does not show that relationship to have been created to avoid the application of ORLTA. Whether viewed as a relationship subject to ORS 90.110(1) or (3), the relationship between plaintiff and defendants was created to assist plaintiff with her recovery from addiction. This is not an instance where a property owner calls its tenants "members" and creates a purported social organization in order to seek to avoid the burdens of ORTLA, nor is it an instance where a landlord provides purported educational classes to its tenants and calls itself an educational institution. As the trial court recognized, "Oxford House exists for the sole purpose to assist drug and alcohol dependent individuals in their recovery." That purpose is necessarily the horse before the cart that is the living arrangement.

In sum, ORS 90.110 excludes Oxford Houses from the reach of ORLTA. A correct application of the statute requires the conclusion that defendants are indeed fraternal and social organizations under ORS 90.110(3) as well as institutions that provide counseling-like services to which residence is incidental under ORS 90.110(1), and that the arrangement between plaintiff and defendants was not created to avoid the application of ORLTA. The primary relationship between plaintiff and defendants was not their landlord-tenant relationship. Whether characterized as a membership relationship with a fraternity or social organization or as a supportive relationship in an institution that provides services similar to counseling, the parties' primary relationship is not burdened by ORLTA. The trial court erred in concluding otherwise and in granting plaintiff's motion for summary judgment and denying defendants' motion.

Reversed and remanded.

**LANDAU, J.,** concurring.

I agree with the majority that defendants are subject to ORS 90.110(3), which excludes from the Oregon Residential Landlord and Tenant Act "[o]ccupancy by a member of a fraternal or social organization in the portion of a structure operated for the benefit of the organization." Because that exclusion applies, in my view it is unnecessary to address whether a different exclusion, stated in ORS 90.110(1), also applies, and I express no opinion about that question.

Haselton, J., joins in this concurrence.

**SCHUMAN, J.,** concurring.

I agree with the majority that defendants are subject to ORS 90.110(1), which excludes from the Oregon Residential Landlord and Tenant Act "[r]esidence at an institution, public or private, if incidental to * * * the provision of * * * counseling * * * or similar service[.]" Because that exclusion applies, my disagreement with the majority's conclusion that Oxford House is a "fraternal or social organization in the portion * * * operated for the benefit of the organization," 196 Or App at 726, does not preclude me from concurring.

I concur.

**EDMONDS, J.,** dissenting.

The majority holds that defendants are exempt from the provisions of the Oregon Residential Landlord and Tenant Act (ORLTA) because their arrangement with plaintiff falls within the provisions of ORS 90.110(1) and (3). For the reasons that follow, I dissent.

The questions presented by this case are questions of statutory interpretation. Therefore, our task is to discern the intent of the legislature. In that quest, we are guided by the template established in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). ORLTA was enacted in 1973 and is patterned after the Uniform Residential Landlord and Tenant Act. *Brewer v. Erwin*, 287 Or 435, 438, 600 P2d 398 (1979). The act is intended to be a comprehensive statutory scheme dealing with the terms of rental

agreements; it imposes obligations on landlords and on tenants, and it spells out their remedies. *Id.* However, ORLTA does not apply to all rental agreements. ORS 90.110 provides:

"Unless created to avoid the application of this chapter, the following arrangements are not governed by this chapter:

"(1) Residence at an institution, public or private, if incidental to detention or the provision of medical, geriatric, educational, counseling, religious or similar service, but not including residence in off-campus nondormitory housing.

"(2) Occupancy of a dwelling unit for no more than 90 days by a purchaser prior to the scheduled closing of a real estate sale or by a seller following the closing of a sale, in either case as permitted under the terms of an agreement for sale of a dwelling unit or the property of which it is a part. The occupancy by a purchaser or seller described in this subsection may be terminated only pursuant to ORS 91.130. A tenant who holds but has not exercised an option to purchase the dwelling unit is not a purchaser for purposes of this subsection.

"(3) Occupancy by a member of a fraternal or social organization in the portion of a structure operated for the benefit of the organization.

"(4) Transient occupancy in a hotel or motel.

"(5) Occupancy by a squatter.

"(6) Vacation occupancy.

"(7) Occupancy by an employee of a landlord whose right to occupancy is conditional upon employment in and about the premises. However, the occupancy by an employee as described in this subsection may be terminated only pursuant to ORS 91.120.

"(8) Occupancy by an owner of a condominium unit or a holder of a proprietary lease in a cooperative.

"(9) Occupancy under a rental agreement covering premises used by the occupant primarily for agricultural purposes."

Preliminarily, I agree with the majority's assertion that

> "[t]he enumerated exclusions essentially fall into two groups: (1) exemptions for short-term housing and (2) exemptions for housing where the primary relationship between the parties is something other than a traditional residential landlord-tenant relationship. The exclusions in ORS 90.110(4) and (6) govern short-term housing ('[t]ransient occupancy in a hotel or motel' and 'vacation occupancy' respectively). Underlying those exclusions is an assumption that the occupant of the property has a primary residence somewhere other than the property at issue and that short-term housing should not be subject to ORLTA. The remainder of the exclusions exempt arrangements where the primary relationship between the parties is something other than a traditional residential landlord-tenant relationship."

196 Or App at 730-31 (footnote omitted). However, the majority fails to grasp the import of its understanding regarding legislative intent. Later in this opinion, I will address the importance of understanding the role that the primary relationship between the parties plays in the construction of ORS 90.110.

Second, this case on its facts intuitively suggests there ought to be an exemption in the law that benefits defendants, given their commendable purpose. We need to be mindful, however, that we cannot legislate in this case. We do not create statutory law; rather, we take the words of the statutes in accordance with their commonly understood meaning and ask whether defendants' proposed meaning is consistent with the meaning of the words that the legislature intended. Any exercise beyond that function exceeds our authority as the judicial arm of the government.

Finally, neither the Supreme Court nor we have been required to interpret the words in either ORS 90.110(1) or ORS 90.110(3). The template for our task is well-established. To determine the legislature's intent, we must first examine the text in the context of ORLTA. *PGE*, 317 Or at 610. In that analysis, we consider rules of statutory construction that bear directly on the reading of the text in context. *Id.* at 611. Context includes related statutes, as well as prior versions of statutes. *See id.*; *State v. Webb*, 324 Or 380,

390, 927 P2d 79 (1996). If the meaning of a statute is not clear from the text and context, we then resort to legislative history and, if necessary, to general maxims of statutory construction. *PGE*, 317 Or at 611-12.

ORS 90.100 establishes definitions of "landlord," ORS 90.100(20), and "tenant," ORS 90.100(42), in broad, encompassing terms. Additionally, ORS 90.115 provides that ORLTA is to have broad application.[1] It follows that any exception to the coverage provided by ORLTA ought to be strictly and narrowly construed so as to not defeat the legislature's overall purpose. Otherwise, the exceptions to the act, broadly construed, could eviscerate its regulatory effect.[2] For instance, ORS 90.110(1) indicates that defendants are excluded from coverage under that exclusion if their arrangement with plaintiff involved "[r]esidence at an institution, public or private" that was incidental to "the provision of medical, geriatric, educational, counseling, religious or similar service[s]." Here, defendants concede that *they* provide no direct counseling or similar rehabilitative service to Oxford House-Ramona residents. That fact ought to be enough to disqualify them from exempt status because, if the exception in subsection (1) is expanded to encompass them, it is also broad enough to encompass other institutions that do not meet the statute's requirements.

Defendants rely, however, on the fact that the residents provide moral support and reinforcement to each other. In defendants' view, that fact satisfies the requirement of ORS 90.110(1) of an occupancy incidental to the provision of a service similar to a counseling service. However, the language of subsection (1) cannot be plausibly interpreted to encompass defendants' interpretation. First, the statute

---

[1] ORS 90.115 provides:

"This chapter applies to, regulates and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located within this state."

[2] The majority takes exception to this understanding. 196 Or App at 730 n 1. It says, "Our task is to make sense of them as a whole." *Id*. I could not agree more. However, it does not make sense to ascribe a broad regulatory purpose to the legislature and then to negate that purpose by interpreting the statutory exceptions to exceed the boundaries of what the legislature has expressed.

requires residence at an "institution, public or private." Second, the residency furnished by the institution must be "incidental to detention or provision of medical, geriatric, educational, counseling, religious or similar service[s]." The meaning of the two parts of the statute when read together are unambiguous. The institution that provides the residence must also provide one of the enumerated services or a similar service. But here, as expressed above, Oxford House-Ramona does not contend that it provides a counseling or similar service to its residents.

The majority contends, however, that, because discussions of drug and alcohol problems occur between residents in Oxford House-Ramona and are intended to occur under the Oxford House model to facilitate recovery, the residents provide each other with services similar to counseling, *i.e.*, "peer supervision, support, and counseling." The majority posits that those actions can be attributed to defendants because, "when members of an Oxford House act, it is, in fact, Oxford House acting." 196 Or App at 739 n 6. Residence in an Oxford House residence is in a sense a kind of membership, *i.e.*, a group of people, but it does not follow from that fact that, when residents provide peer reinforcement through discussions about their addictions and other problems, they are defendants' agents. Rather, the record indicates that, although the Oxford House model encourages the residents to support each other, defendants do not supervise their residents or otherwise offer them any services. Indeed, the Oxford House model is specifically designed to provide for *unsupervised* recovery, the antithesis of an institution that provides services where residence is incidental to the service provided. Because there is no evidence that peer reinforcement is the primary object of the arrangement between Oxford House and its tenants, the majority's theory under ORS 90.110(1) fails.

If, for the sake of argument, the residents of Oxford House-Ramona act as the agents of defendants when they interact with other residents, defendants still do not qualify for the exemption under ORS 90.110(1) because the peer reinforcement provided by residents to each other is not similar to "counseling." "Counseling" is "a practice or professional service designed to guide an individual to a better

understanding of his problems and potentialities by utilizing modern psychological principals and methods[.]" *Webster's Third New Int'l Dictionary* 518 (unabridged ed 2002). The record indicates that Oxford House residents are roommates and, like many roommates, they discuss their problems with each other, confront one another about problems, and prefer to live with others who hold similar views. Nothing in the record indicates that the residents' reinforcement of each other or their peer counseling constitute the professional therapy that the statute's language contemplates or that the residents are aware of, trained in, or utilize modern psychological therapeutic methods. Under any common understanding of the meaning of the text of ORS 90.110(1), it reasonably cannot be said that the activities that residents direct at each other constitute "counseling or similar services" within the meaning of the statute.

Finally, even if it can be said that defendants furnish a living environment in which the kind of counseling contemplated by the statute can occur, defendants are not the kinds of institutions that ORS 90.110(1) excludes from ORLTA coverage. The services listed in the statute—medical, geriatric, educational, counseling, and religious—indicate the kinds of institutions to which ORS 90.110(1) applies. All of the institutions listed in the statute are institutions whose *primary* purpose is to provide one of the enumerated services or a similar service. That principle was recognized in *Gray v. Pierce County Housing Authority*, 123 Wash App 744, 97 P3d 26 (2004). In that case, the court considered whether the Pierce County Housing Authority (PCHA), qualified for an exemption under RCW 59.18.040(1). That statute provides that "[r]esidence at an institution, whether public or private, where residence is merely incidental to detention or the provision of medical, religious, educational, recreational, or similar services * * *" is excluded from coverage under Washington's Residential Landlord and Tenant Act. The court concluded that PCHA did not qualify under the statute, even though it provided the kind of educational services to residents contemplated by the statute, because PCHA's *primary purpose* was to provide housing for low-income tenants. *Gray*, 123 Wash App at 758-59, 97 P3d at 33. The court also concluded that, because PCHA was not the kind of institution

to which the statute applied, it need not determine whether the plaintiff's residence was incidental to the provision of any educational service.

Defendants are similar to the PCHA in that their *primary* purpose is not to provide one of the enumerated services in ORS 90.110(1) to which residence is incidental, but, rather, to provide low-cost housing in which individuals can support each other as they recover from addictions. Thus, even if the peer reinforcement that occurs between residents can somehow constitute "services" provided by defendants, the fact remains that defendants' primary purpose is to provide low-cost housing. That understanding is also consistent with one of the trial court's written findings in this case:

> "While I certainly do recognize that Oxford House exists for the sole purpose [of] assist[ing] drug and alcohol dependent individuals in their recovery, the way in which Oxford House does so is to provide drug and alcohol free housing. It is the housing that is central to the relationship."

The trial court's finding is supported by uncontroverted evidence in the record that defendant's primary purpose is to provide housing. Because a reasonable trier of fact could not conclude on the summary judgment record before us that that purpose is secondary or incidental to some other purpose of defendants, they are not the kind of institutions to which ORS 90.110(1), by its terms, applies.

In summary, there are three independent but related reasons in light of the statutory requirements why defendants do not qualify under ORS 90.110(1): (1) Defendants provided no services to plaintiff of the kind enumerated in the statute; (2) plaintiff's occupancy in Oxford House Ramona was the primary and not the incidental object of the arrangement between her and defendants; and (3) even if it could be held that defendants provided the kind of services to plaintiff contemplated by the statute, defendants themselves are not the kinds of institutions that ORS 90.110(1) excludes from ORLTA because *their* primary purpose is to provide a particular kind of living environment to individuals recovering from addictions. In contrast, the statute requires that the residency be "incidental" to the service provided.

Defendants also rely on ORS 90.110(3). That statute provides that an "arrangement" is not governed by ORLTA if the relevant landlord-tenant relationship consists of an "[o]ccupancy by a member of a fraternal or social organization in the portion of a structure operated for the benefit of the organization." The key phrase in the statute is the phrase "fraternal or social organization." The statute itself does not provide a definition of those terms. Also, the text and context of those terms do not indicate how broadly the legislature intended those terms to be understood. Indeed, the terms are ambiguous as demonstrated by the majority's reasoning. The majority, relying on selected dictionary definitions of "fraternity" and "social" interprets those terms to refer to "associated groups of people with the same pursuit," 196 Or App at 733, and groups of people that are "concerned with the welfare of human beings as members of society," 196 Or App at 734 (internal quotation marks omitted). Those definitions are plausible, but so are definitions that are more limited. Fraternal organizations can be understood to include groups traditionally considered to be fraternal organizations, such as

> "the grand and subordinate lodges of the Masons, the grand and subordinate lodges of the Knights of Pythias, the Knights of Columbus, the Benevolent and Protective Order of Elks, the Fraternal Order of Eagles, the Loyal Order of Moose, the Independent Order of Odd Fellows, the Oregon State Grange, the American Legion and the Veterans of Foreign Wars."

ORS 307.134 (defining "fraternal organization" for the purpose of exemption from property taxes). Similarly, social organizations such as the Salvation Army, United Way, YMCA, and YWCA could have been contemplated by the legislature when it used the phrase "fraternal or social organization." Moreover, there are any number of plausible definitions that exist along with those alternatives. It is apparent from all of the above possibilities that ORS 90.110(3) is ambiguous because its terms are susceptible to more than one reasonable interpretation.

Indeed, the uniform act on which ORLTA was patterned was designed to be "somewhat vague," Comment, *The Evolution of the Oregon Residential Landlord and Tenant Act*, 56 Or L Rev 655, 665 n 59 (1977), and the drafters of the uniform act "tried not to be too detailed [and] felt that much

should be left to the courts in developing the details of a land-lord/tenant relationship," Minutes, Senate Local Government and Urban Affairs Committee, SB 159, Feb 1, 1973, 2 (statement of James Clarke, member, National Conference of Commissioners on Uniform State Laws). In effect, the ambiguity in the phrase "fraternal or social organization" amounts to a legislative delegation of the statute's meaning to the courts. However, that delegation is not unfettered. Any meaning developed by us must be consistent with the legislature's overall intent.

Given that ORS 90.110(3) is ambiguous, I turn to its legislative history. There is scant history of the Oregon legislature's own intentions. However, a commentary to a uniform act that is enacted by the Oregon legislature is part of the act's legislative history. *State of Oregon DCS v. Anderson*, 189 Or App 162, 169, 74 P3d 1149, *rev den*, 336 Or 92 (2003). As stated above, ORS 90.110(3) finds its source in the Uniform Residential Landlord and Tenant Act. The commentary to the uniform act states that the act "is not intended to apply where residence is incidental to another primary purpose[.]" Uniform Residential Landlord and Tenant Act § 1.202 Comment, 7B ULA 539 (2000). The majority contends that the commentary's reference that the act is not intended to apply where occupancy or residence is incidental does not apply to any of the subsections of ORS 90.110 other than subsection (1). 196 Or App at 732-33 n 3. However, there is nothing in the commentary's language that expressly limits its reference to subsection (1). Indeed, the Commentary suggests otherwise by expressly referring to "athletic club[s]" as one kind of exempt fraternal or social organization, thereby distinguishing such organizations from arrangements where occupancy or residency *is* the primary purpose of the arrangement. In summary, the suggestion from the available legislative history is that the legislature intended the exceptions to ORLTA to be limited to arrangements where residence or occupancy is *not* the primary object of the arrangement. However, that suggestion may not be strong enough to preclude the doubt that the ambiguity in the words "fraternal or social organization" in ORS 90.110(3) raises.

Under such circumstances we are required to undertake a third-level *PGE* analysis, *see PGE*, 317 Or at 612, to ascertain what the legislature would have intended if it had

contemplated the facts of this case. We can be confident; the legislature would not have intended that ORS 90.110(3) produce results that are "inconsistent with the apparent policy of the legislation as a whole." *State v. Vasquez-Rubio*, 323 Or 275, 282-83, 917 P2d 494 (1996). With that guidance, we turn back to the whole of ORS 90.110.

Legislative intent may be indicated by common threads in all the exemptions in ORS 90.110. For example, ORS 90.110(1) excludes an arrangement between an institution that exists to provide particular kinds of service to tenants where residence at the institution is secondary to the provision of that service. ORS 90.110(2) excludes short-term occupancy by a purchaser of real property prior to the closing of a sale. That occupancy must be for less than 90 days, or the relationship will be covered by ORLTA. Thus, under that exception to ORLTA, the residency is secondary to the real estate sale. Similarly, ORS 90.110(4), ORS 90.110(5), and ORS 90.110(6) cover short-term arrangements when the actual residency in those kinds of tenancies is secondary to the primary purpose of the tenancy. But if the tenancies described in subsections (4) and (5) exceed 30 or 45 days, respectively, then those types of arrangements are covered by ORLTA.[3] Those exceptions to the exceptions in the ORLTA further show a legislative intent to focus on the primary object of the arrangement. Similarly, ORS 90.110(7) excludes residence by employees in the premises in which they work where that occupancy is conditioned upon continued employment, and ORS 90.110(8) excludes occupancy by condominium owners and those who hold a proprietary lease in a cooperative. Finally, ORS 90.110(9) excludes occupancy subordinate to agricultural-related purposes.

One thing is common to all of the above exemptions: they apply to particular kinds of occupancies and residencies where the occupancy is subordinate to another primary purpose. That common thread leads to the conclusion that the legislature intended to exclude certain rental arrangements in which occupancy was secondary to another primary purpose of the arrangement specified in the exception, as the majority itself observes. When that expression of legislative

---

[3] *See also* ORS 90.100(43); ORS 90.100(45).

intent is considered in light of the overall purposes of ORLTA, the breadth of the majority's construction of the term "fraternal" as "groups of people organized for a common purpose or goal" becomes untenable because it fails to differentiate between the primary and secondary objects of such arrangements. Taken to its logical extension, the majority's reasoning means that all kinds of groups of people fall within the exception in subsection (3) of the statute; it would exclude for instance, groups of people whose primary object in living together is because they want to live in a particular kind of housing, *e.g.*, low cost, smoke free, alcohol free, drug free, urban, or rural. In those arrangements, the occupancy is not secondary to the benefits of the relationship; rather, the benefits of the occupancy in such arrangements are the *primary* objects of the arrangement. Here, too, there is no evidence that peer counseling was the primary object of plaintiff's occupancy or residency in Oxford House-Ramona. In sum, while the majority acknowledges that the exclusions in ORS 90.110 exempt arrangements when the primary purpose of the relationship between the parties is something other than a landlord-tenant relationship, *see* 196 Or App at 730-31, it fails to apply that understanding to the facts of this case where low-cost housing is, as supported by uncontroverted evidence in the record, the primary object of the arrangement between plaintiff and defendants.[4]

That same analytical flaw also exists in the majority's interpretation of the words "social organization" in ORS 90.110(3), which it interprets to refer to groups that are "concerned with the welfare of human beings as members of society." 196 Or App at 734-35 (internal quotation marks omitted). Many groups are concerned with the welfare of human beings as members of society to some degree. Again, such an expansive definition thwarts the intended broad application

---

[4] The majority attempts to reason itself out of its self-created predicament by asserting that "[t]he primary relationship between parties may be something other than a landlord-tenant relationship even if the primary purpose of the landlord or tenant or both is housing." 196 Or App at 737. I confess that I do not understand the majority's reasoning as it relates to the text of ORS 90.110(3). Under ORLTA's language, the nature of the relationship or arrangement between the parties, whether it is a landlord-tenant arrangement or an exempt arrangement, is always determined by the arrangement's primary purpose or object as the majority appears to acknowledge.

of ORLTA to regulate all landlord-tenant arrangements. Furthermore, it ignores the scheme of ORS 90.110, which excludes a number of rental arrangements in which the tenant's residence or occupancy is secondary to the primary purpose stated in the exceptions. Nonetheless, the majority asserts that "Oxford House's primary purpose is to assist addicts in recovery." 196 Or App at 736. But that assertion is belied by the uncontroverted evidence that defendants in this case furnish no therapy or counseling services to their occupants. Rather, Oxford House's purpose, according to the record in this case, is to furnish low-cost housing so that its residents can personally address their addictions in a drug-free living environment.

Finally, the majority posits that its construction of the term "social" is consistent with the meaning given to that term in a Connecticut statute in *YMCA of Stamford v. Bentley*, 37 Conn L Rptr 397 (Conn Super Ct 2004). But in that case, the court based its decision that the YMCA was a social organization in large part on the YMCA's charter, which declared that the primary purpose of the YMCA was to " 'carry out various charitable projects for the religious, social, and educational development of its members.' " In contrast to those facts, the record in this case establishes that residence at Oxford House-Ramona is not secondary to defendants' social purposes. Indeed, in its manual, Oxford House declares that "Oxford House has as its primary goal the provision of housing and rehabilitative support for the alcoholic who wants to stop drinking and stay stopped." In a discussion of that primary goal, the manual states, "Oxford House *is* group housing." (Emphasis added.) With those statements in mind, the puzzle of whether defendants fit within the meaning of the ambiguous ORS 90.110(3) can be resolved in light of the general legislative intent demonstrated by ORS 90.110 and ORLTA as a whole. It seems unlikely that the legislature would have intended to enact a specific exception with strict requirements in ORS 90.110(1) and then create an accompanying ambiguous exemption that permits an organization to evade the requirements imposed in the previous exception. That observation becomes particularly persuasive in light of the broad application of ORLTA and the corresponding legislative policy to limit its exceptions to arrangements where residence is not primary.

In summary, any interpretation of the words "fraternal or social organization" must be consistent with the underlying policies of ORLTA. Those governing policies are the broad regulatory policy of the act as a whole and the constraint on the scope of the exceptions to the act to arrangements where residence is not the primary object of the arrangement. Defendants do not qualify for the exceptions in ORS 90.110(1) and (3) because their characteristics do not satisfy the requirements of either subsection in light of the statutes' underlying policies. We lack the authority to create any other exception to the act; that task belongs exclusively to the legislature, and for purposes of this case, it means that defendants' argument can only be properly made to the legislature.

For those reasons, I dissent.

Brewer, C. J., and Wollheim, J., join in this dissent.